UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALLEY COMMUNITY BANK, | No. C-11-0574 EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| PROGRESSIVE CASUALTY INSURANCE COMPANY, | |
| Defendant. | **(Docket Nos. 38, 43)** |
| _____/ | |

Defendant's motion for summary judgment and Plaintiff's cross motion for partial summary judgment came on before the Court on February 3, 2012. For the reasons set forth below, the Court **GRANTS** Defendant's motion for summary judgment and **DENIES** Plaintiff's cross motion for partial summary judgment.

## I.   FACTUAL & PROCEDURAL HISTORY

In June 2007, Plaintiff submitted an application to Defendant for Bond and Safe Depository Coverage. Docket No. 41, Exh. E ("Bond Application"). In the Bond Application, Plaintiff answered "yes" to the question, "Are signatures on all notes and documents obtained in the presence of a bank employee, attorney, closing agent, escrow agent or title company employee (including loans originated by third parties)?" Bond Application at 2. In signing the Bond Application, Plaintiff's EVP CFO Rebecca Holowich understood "that the phrase 'all notes and documents' refer to everything that is signed by a customer or somebody else in connection with a loan." Docket No. 41, Exh. B 47:2-6 ("Holowich Dep."). Holowich further understood that this was a "material

representation," in that "material meant something essential to Defendant's decision on the application. Holowich Dep. 62:4-23. Based on the Bond Application, Defendant issued a Bond that would cover up to $3.5 million in losses. Docket No. 41, Exh. E ("Bond").

In January 2008, William "Boots" Del Biaggio applied for a $4.25 million loan from Plaintiff. Compl. ¶ 4(d). In exchange for this loan, Del Biaggio offered as collateral securities he supposedly owned in accounts at the broker-dealer, Merriman Curhan Ford & Company ("Merriman"). Compl. ¶ 5. Del Biaggio did not in fact own any securities. Instead, Del Biaggio had received the account statements of *other* Merriman customers from David Scott Cacchione, a Merriman employee. Docket No. 39, Exh. B at 2-3 ("Cacchione Guilty Plea"). Del Biaggio then altered the statements so that they would bear his name, and used these altered statements to obtain loans ("Merriman Statements"). Compl. ¶ 4(c).

When applying for the loan, Del Biaggio provided Plaintiff with electronic PDFs of the Merriman Statements that were altered to bear his name. Compl. ¶ 4(d); Docket No. 41-1 142:6-13 ("Hickel Dep."). The Merriman Statements represented account values totaling $7.5 million. Docket No. 40, Exh. 4. In connection with the loan from Plaintiff, Del Biaggio executed a Promissory Note, Business Loan Agreement, Commercial Pledge Agreement, Commercial Security Agreement, Notice of Final Agreement and a Disbursement Request and Authorization, and Account Control Agreement ("ACA"). Docket No. 41, Exh. E. Prior to receiving the ACA, Plaintiff's Chief Credit Officer Greg Hickel contacted Cacchione and informed him that Plaintiff required an ACA executed by Merriman. Docket No. 41-1 118:4-21 ("Hickel Dep."). Hickel had further conversations with Cacchione, in which Cacchione acknowledged that he had received the ACA with all of the required signatures, and would code the accounts accordingly. Hickel Dep. 143:25-144:25; Docket No. 41, Exh. E.

Plaintiff approved the loan. Shortly after Plaintiff loaned Del Biaggio the $4.25 million, Del Biaggio defaulted. Zangwill Decl. ¶ 3(H); Compl. ¶ 4(e). Del Biaggio and Cacchione were eventually arrested. Cacchione pled guilty to aiding and abetting a scheme to defraud. Cacchione Guilty Plea at 2. In his guilty plea, Cacchione admitted to providing copies of client account statements to Del Biaggio, and that he had signed falsified ACAs that gave the appearance that Del

Biaggio owned and controlled the client accounts. Cacchione Guilty Plea at 2-3. However, although he admits to his involvement with numerous fraudulent loans, Cacchione denies that he signed the ACA used in Plaintiff's loan. Docket No. 46 ¶ 5 ("Cacchione Decl.").

Plaintiff filed a claim with Defendant for payment under the Bond issued by Defendant, on the ground that its loss fell within Clause E. Clause E states:

> (E) Loss **resulting directly** from the Insured having, in good faith, for its own account or for the account of others,
>
> (1) acquired, sold or delivered or given value, extended credit or assumed liability, on the faith of, any Written, Original
>
>     (a) Certified Security,
>
>     (b) Document of Title,
>
>     (c) Deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property,
>
>     (d) Certificate of Origin or Title,
>
>     (e) Certificate of Deposit,
>
>     (f) Evidence of Debt,
>
>     (g) Corporate, partnership or personal Guarantee, or
>
>     (h) **Security Agreement**,
>
> which (I) bears a handwritten signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any other person whose signature is material to the validity or enforceability of the security, which is a Forgery, or (ii) is altered, or (iii) is lot or stolen;
>
> (2) guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, endorsement of any items listed in (a) through (h) above; or
>
> (3) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any item listed in (a) through (e) above which is a Counterfeit.

> **Actual physical possession** of the items listed in (a) through (h) above by the Insured, its correspondent bank or other authorized representative, **is a condition precedent to the Insured's having relied on the faith of such items**;
>
> A reproduction of a handwritten signature is treated the same as the handwritten signature. An electronic or digital signature is not treated as a reproduction of a handwritten signature.

Bond at 3 (emphasis added).

Defendant ultimately denied Plaintiff's claim on the grounds that: (1) the ACA and Merriman Statements were not "security agreements" as defined by the Bond; (2) the ACA was not a forgery as defined by the Bond; (3) Plaintiff did not have possession of the original Merriman Statements when it made the loan; (4) Plaintiff's loss did not "result directly" from the ACA or the Merriman Statements; and (5) Plaintiff made material misrepresentations in the Bond Application that would allow Defendant to rescind coverage entirely. Docket No. 40, Exh. 7 at 6-10. Following Defendant's denial of coverage, Plaintiff brought this suit against Defendant, alleging claims for: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing, (3) fraud, and (4) declaratory relief. Compl. ¶¶ 12, 15, 19, 29. Defendant now moves for summary judgment. Plaintiff, in filing its opposition, requests partial summary judgment. Docket No. 43 ("Opp.").

## II. DISCUSSION

A.  Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252. All reasonable inferences are drawn in the non-moving party's favor. *Id.* at 255.

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party has the ultimate burden of proof, the moving party may prevail on a motion for summary judgment by pointing to the non-moving party's failure "to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322.[1]

Under California law, the insured has the burden of showing that an event falls within the scope of basic coverage under the policy. *Garvey v. State Farm Fire & Casualty Co.*, 48 Cal. 3d 395, 406 (1989). In construing the contract, the court looks to the reasonable expectations of the insured. *Mitsui Mfrs. Bank v. Fed. Ins. Co.*, 795 F.2d 827, 829 (9th Cir. 1986). Although ambiguities in the contract language will be construed against the insurer, the court should not search for an ambiguity when the policy terms are clear. *Id.* at 829-30. Thus, a claim of ambiguity cannot be based on a strained interpretation of the policy terms. *Id.* at 829.

B.  Breach of Contract

    1.  Security Agreement

Defendant argues that there is no coverage because there is no forged "security agreement" as defined by the Bond. The Bond states: "Security Agreement means a Written agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." Bond at 9. In the instant case, Plaintiff asserts that two documents fulfill the security agreement requirement: the allegedly forged ACA and the altered Merriman Statements.

        a.  Account Control Agreement

The ACA is an acknowledgment by Merriman that Del Biaggio and Plaintiff entered into a loan agreement, and that the Merriman accounts would be used as collateral in exchange for the loan. Docket No. 41, Exh. E ("ACA"). The ACA states that Del Biaggio "desires to secure [his] performance under the Loan Documents . . . by granting to Lender a security interest in certain of [Del Biaggio's] assets, including (without limitation) the Accounts." ACA at 1. To this end,

---

[1] For the purposes of this summary judgment motion, the Court relied upon Cacchione's Declaration ¶ 5, which was the subject of an objection. As to this statement, the objection is overruled. All other objections are deemed moot.

Merriman acknowledged and agreed that the ACA "constitutes a control agreement by which [Merriman] has agreed that it will comply with entitlement orders originated by the [Plaintiff], without further consent by [Del Biaggio]." ACA at 1.

Defendant argues that the ACA is not a security agreement as defined by the Bond because it neither creates a security interest nor secures payment of an obligation. Defendant points to the ACA's language, which specifically states: "[Del Biaggio] and [Plaintiff] notify [Merriman] that by **separate agreement** [Del Biaggio] has granted [Plaintiff] a security interest in (i) the Account . . . ." ACA at 1 (emphasis added). These separate agreements are found in the Commercial Pledge Agreement and the Commercial Security Agreement.[2] Hickel Dep. 139:14-19. These documents expressly create an interest in the borrower's collateral. By referring to a security interest created by "separate agreement," the ACA implies it does not itself create a security interest.

Plaintiff counters with two arguments. First, Plaintiff argues that there are cases holding that an ACA is a security agreement. However, neither case cited by Plaintiff held that the ACA was a security agreement; instead, both cases were simply describing the facts of that specific case with no analysis of the terms of the ACA in question or an insurance bond.[3] In *Wachovia Bank, N.A. v. Zomox Inc.*, the court's alleged "holding" that the ACA gave the Bank a security interest came in the court's statements of the facts. Case No. 2:09-CV-0076, 2009 U.S. Dist. LEXIS 117716, at *6 (S.D. Ohio Dec. 17, 2009). There is no discussion of the language of the Deposit Account Control Agreement, and no indication that there was any dispute over whether that specific Deposit Account Control Agreement actually gave the plaintiff a security interest. Likewise, in *Fifth Third Bank v. Lincoln Financial Securities Corp.*, a brokerage firm was required to execute an ACA that gave control to a bank over how assets would be transferred out of a specified account. Civil Action No. 4:06CV-122-M, 2009 U.S. Dist. LEXIS 73000, at *3, 6-7 (W.D. Ky. Aug. 18, 2009). The court did not indicate if the ACA itself created a security interest, and did not otherwise discuss the terms of this ACA. Hence Plaintiff's authorities are not persuasive.

---

[2] Neither of these documents may be used as the basis for coverage because they were not forged.

[3] Neither case discussed bond terms because neither case involved insurance coverage.

6

1    Second, Plaintiff argues that the ACA should be read in connection with the promissory note,
2 the commercial pledge, and the commercial security agreement. Under California Civil Code §
3 1642, "[s]everal contracts relating to the same matters, between the same parties, and made as parts
4 of substantially one transaction, are to be taken together." Thus, Plaintiff argues that because the
5 ACA, Promissory Note, Commercial Security Agreement, and the Commercial Pledge Agreement
6 all relate to the Del Biaggio loan, they should be read as a single document and that the ACA should
7 be read as creating the security interest which is in fact created by the Commercial Security
8 Agreement and the Commercial Pledge Agreement. Opp. at 3. Several California cases suggest that
9 multiple documents can form a security agreement, defined by California Uniform Commercial
10 Code § 9102(73) as "an agreement that creates or provides for a security interest." For example, in
11 *In re Center Auto Parts*, the court found that a financing statement, standing alone, was not a
12 security agreement because it did not contain the debtor's grant of a security interest. No. 214, 187-
13 FW, 1968 WL 9209 (C.D. Cal. Aug. 23, 1968). When read together with the promissory note, the
14 court found that the two documents formed a security agreement. *Id.*; *see also Nolden v. Plant
15 Reclamation*, 504 F.2d 1056, 1060 (9th Cir. 1974) (promissory note and financing statement
16 together constituted a security agreement); *Komas v. Future Sys., Inc.*, 71 Cal. App. 3d 809, 815-16
17 (1977) (loan application, promissory note, and financing statement together created a security
18 agreement).

19    This argument is persuasive. The ACA plays an important role in enforcement of the
20 security interest. The ACA secures payment or performance of an obligation created by the
21 Commercial Security Agreement and Commercial Pledge Agreement. The ACA prevents Del
22 Biaggio from selling, trading, exchanging, or disposing of the Merriman accounts, and requires that
23 Merriman comply with Plaintiff's instructions regarding withdrawal, transfer, payment and
24 redemption. ACA at 2. Thus, the ACA allows Plaintiff to ensure that its security interest in the
25 Merriman accounts will be performed should it wish to collect on the loan. In this regard, *In re
26 Center Auto Parts*, *Nolden v. Plant Reclamation* and *Komas v. Future Sys., Inc.* are apposite. If a
27 financing statement in conjunction with a promissory note creates a security agreement, so should
28

7

1  the ACA in conjunction with the Commercial Security and Pledge Agreements.  Consistent with the

2  Bond definition, the ACA "secures payment or performance of an obligation."

3       Defendant argues that the ACA cannot be read together with the other loan documents

4  because the Bond has an Anti-Bundling Clause, which states:

> Section 9.  If any Insuring Agreement requires that an enumerated type of document be altered or counterfeit, or contain a signature which is a Forgery or obtained through trick, artifice, fraud or false pretenses, the alteration or counterfeit or signature must be on or of the enumerated document itself not on or of some other document submitted with, accompanying or incorporated by reference into the enumerated document.

9  Bond at 15.  Thus, it contends that even if the Commercial Security Agreement and Commercial

10 Pledge Agreement create an interest, the forgery must be on that document.  Here, the allegedly

11 forged signature is on the ACA.  But the effect of the Anti-Bundling Clause begs the question.  The

12 clause requires forgery be on "an enumerated type of document" – *i.e.*, a "security agreement."  The

13 Clause does not define what a security agreement is and whether that term encompasses the ACA.

       b.     <u>Merriman Statements</u>

15      In contrast, the Court finds that the Merriman Statements are not security agreements

16 because they neither create a security interest nor secure performance or payment.[4]  The Statements

17 merely constitute evidence of wealth, information used by Plaintiff to base its lending decision.

18      In *KW Bancshares, Inc. v. Syndicates of Underwriters at Lloyd's*, the court found that a

19 document stating the financial worth of the proposed collateral did not create a security interest or

20 secure performance.  965 F. Supp. 1047, 1054 (W.D. Tenn. 1997).  There, a borrower had received a

21 loan from the bank by claiming that he would be receiving a $811,500 bonus from his job.  *Id.* at

22 1049.  The borrower offered to assign the bank a portion of his bonus, and submitted four documents

23 including the "Crenshaw Letter," a letter purportedly from the borrower's employer which stated

24 that the borrower would be receiving this bonus and that the employer would assign a portion of the

25 bonus to the bank.  *Id.* at 1049-50.  Each of these documents proved to be fakes or forgeries, and the

---

[4] Plaintiff provided no basis for its arguments that the Merriman Statements are security agreements.  *See* Opp. at 12 ("And the altered original Account Statements are covered under coverage E").

8

borrower did not in fact receive a bonus. *Id.* at 1050. The court found that the Crenshaw Letter was not a security agreement because it did not create any interest in personal property or secure any payment or performance of an obligation to the bank. *Id.* at 1055. Instead, the court found that the Crenshaw letter had no real legal value to the bank, which was why the bank had the borrower and the borrower's employer had signed a separate document assigning the bonus payment to the bank. *Id.* Thus, it was this separate assignment that created the interest in the alleged bonus in favor of the bank, not the Crenshaw Letter. *Id.*

In the instant case, the Merriman Statements are brokerage account statements that list the amounts held in each portfolio. *See* Docket No. 40, Exh. 4. These account statements do not create a security interest or secure payment or performance, but simply identify the assets that are held in each account. Like the Crenshaw Letter in *KW Bancshares, Inc.*, the Merriman Statements falsely informed Plaintiff that Del Biaggio held assets when he in fact did not. The Merriman Statements alone have no legal value or effect. Accordingly, the Merriman Statements are not security agreements as defined by the Bond, and cannot serve as a basis for coverage.

2.  <u>Original Document as to Merriman Statements</u>

The Court finds that even if the Merriman Statements were a security agreement, the Bank lacked the original Merriman Statements as required by the Bond.[5] The relevant provision states that the insured bank must have extended credit on the faith of any written, original document covered by Clause E. Bond at 3. Further, the Bond specifies: "Actual physical possession of the items listed in (a) through (h) above by the Insured, its correspondent bank or other authorized representative, is a condition precedent to the Insured's having relied on the faith of such items." Bond at 3. "Original" is defined by the bond as "the first rendering or archetype and does not include photocopies or electronic transmissions even if received and printed." Bond at 8.

Courts have upheld similar bond provisions requiring physical possession of the original document at the time of extending credit. *See, e.g.*, *Hamilton Bank v. Ins. Co. of N. Am.*, 557 A.2d 747, 750 (Pa. Super. Ct. 1989) ("Therefore, the clear meaning of the blanket bond mandates that

---

[5] The parties do not dispute that Plaintiff has the original ACA.

1  Bank must physically possess the original bills of lading at the time of extending credit before it may
2  recover its losses"). In *National City Bank v. St. Paul Fire & Marine Insurance Co.*, the Minnesota
3  Supreme Court found that the rationale for a bond's physical possession condition is:

> to allow an insured bank the opportunity to examine a document and to contact others to verify a document's authenticity. Although such verification is not required by Clause (E) of the Bond, a loss that could easily have been avoided is a business loss if sound business practice would have required some investigation. . . . [A]n insured bank has a duty to exercise some minimal level of care when making a loan. The failure to follow sound business practices and verify authenticity is a business risk taken by banks and not an insured risk covered by the Bond.

447 N.W.2d 171, 177 (Minn. 1989).

Here, Plaintiff never had physical possession of the Merriman Statements. Instead, Plaintiff only had an electronic PDF version of the Merriman Statements. Plaintiff contends that this is sufficient, as the originals of the Merriman Statements *are* the electronic versions. Opp. at 11. Plaintiff claim that Del Biaggio altered the electronic version of the Merriman Statements, and that these altered electronic versions were then forwarded to Hickel. Opp. at 11. However, the Bond terms explicitly prevent Plaintiff from relying on the electronic version, excluding electronic transmissions from the "Original" definition. As Plaintiff never physically possessed the original Merriman Statements, Plaintiff fail to satisfy the "original document" requirement as to the Merriman Statements. Accordingly, the Merriman Statements cannot serve as a basis for coverage in the instant case even if they were considered security agreements.

### 3. Forgery

The Court finds that there is a factual issue regarding whether Cacchione's signature on the ACA is a forgery.[6] In Cacchione's guilty plea, Cacchione stated that at the time of Plaintiff's loan to Del Biaggio, he had signed falsified ACAs in support of Del Biaggio's falsely obtained loans. Docket No. 39, Exh. D. Plaintiff's Credit Officer, Greg Hickel, stated that he had spoken to Cacchione about the need for an ACA executed by Merriman, and that Cacchione had stated that he would prepare and send Hickel the ACA. Hickel Dep. 118:4-21. Cacchione then sent Hickel a draft

---

[6] The parties do not dispute that the Merriman Statements were altered to include Del Biaggio's name in place of the actual owners of the Merriman accounts.

of the ACA with a signature line for Cacchione, and later acknowledged that he had received the ACA signed by all parties and would code the accounts covered by the ACA. Hickel Dep. 132:2-9, 143:10-144:6. While such evidence strongly suggests that Cacchione did in fact sign the ACA used in Plaintiff's loan to Del Biaggio, Cacchione unequivocally states in his declaration and deposition that he did not sign the ACA. Cacchione Decl. ¶ 5; Docket No. 44, Exh. A 92:21-93:16 ("Cacchione Dep."). Because Cacchione's denial creates an issue of fact regarding whether Cacchione's signature on the ACA is a forgery, the Court finds that resolution of this issue is inappropriate at the summary judgment stage.

### 4. Direct Loss

Even though the Court finds the ACA constituted a security agreement and there is a disputed issue of fact whether it was forged, the Court grants summary judgment because Plaintiff's loss was not a direct result of any alleged forgery on the ACA. Plaintiff would have suffered the same losses even if Cacchione's signature on the ACA was legitimate. Plaintiff's loss resulted not from the forgery, but from the fact that Del Biaggio did not own any of the securities in the Merriman Accounts as he had falsely represented. The Court's conclusion is compelled by the Bond language and applicable law.

#### a. Direct Cause

The Bond only covers "[l]oss resulting directly" from Plaintiff extending credit on the faith of documents covered by Clause E. In determining whether losses are "directly caused" by a forged documents, the courts have distinguished between the typical banker's bond and credit insurance. Credit insurance is "insurance provided against losses from bad debts arising from the sale of goods on credit, coverage for uncollectible accounts." *Calcasieu-Marine Nat'l Bank v. Am. Emp'rs' Ins. Co.*, 533 F.2d 290, 299 (5th Cir. 1976). In contrast, a standard banker's bond:

> insures that the documents submitted to the bank in connection with a loan are genuine and authentic. If they are not, and a loss is caused thereby, the bonding company guarantees the loss. On the other hand, the bonding company does not guarantee the **truth** of said documents. If they are not truthful, and a loss results therefrom, it is not guaranteed.

11

*KW Bancshares, Inc.*, 965 F. Supp. at 1054 (emphasis added) (quoting *Liberty Nat'l Bank v. Aetna Life & Casualty Co.*, 568 F. Supp. 860, 863 (D.N.J. 1983)). This allocation of losses is justified by the fact that "[a] bank cannot protect against counterfeit and forged documents. It can, on the other hand, investigate the assertions made therein through credit checks, appraisals, title searches, financial statements, and the like." *Id.* Thus, the standard banker's bond is not a credit insurance policy, and "excludes coverage for most losses resulting from nonpayment of a loan obtained through fraud or false pretenses unless the loss is specifically covered under one of the insuring agreements." *Id.*; *see also Republic Nat'l Bank of Miami v. Fidelity & Deposit Co. of Md.*, 894 F.2d 1255, 1263 (11th Cir. 1990) ("a banker's blanket bond is not a policy of credit insurance and does not protect the bank when it simply makes a bad business deal.") (cited by *Bank of Bozeman v. BancInsure, Inc.*, 404 Fed. Appx. 117, 119 (9th Cir. 2010)).

In *KW Bancshares, Inc.*, the court held that the bank's loss did not result directly from the loan, even though the loan was based on the Crenshaw Letter stating that the borrower had earned the bonus and that a portion of the bonus would be paid to the bank. 965 F. Supp. at 1054. Instead, the court found that the bank's "loss was caused by the fact that the statements contained in the Crenshaw letter were not true –[the borrower] was not entitled to an annual bonus of $811,500." *Id.* Even if the signature on the letter was genuine, the bank's loss would have occurred because the alleged security was worthless. *Id.* The court thus distinguished between the bond's coverage and credit insurance, finding that the bond would not cover losses resulting from a loan obtained under false pretenses. *Id.*

Similarly, in *French American Banking Corp. v. Flota Mercante Grancolombiana*, a bank sought to recover $4M from its insurance company. 752 F. Supp. 83, 84 (S.D.N.Y. 1990). There, the bank had made loans to the Columbian Coffee Company based on bills of lading for coffee shipments. *Id.* The bills of lading turned out to be false, and the bank sought to have its losses covered by its insurer. *Id.* at 87. After the insurer denied coverage, the bank filed suit against the insurer. *Id.* The court found that the bank's losses were not covered by the insurance bond, which required a "loss resulting directly from" the bank acting upon a forged document. *Id.* at 90. In short, the bank's "losses resulted not from the purported forgeries but from the . . . fraudulent

scheme. . . . Even if the signatures had been identified and genuine, the bills still represented non-existent or previously completed transactions and [the bank] would have still suffered losses identical to those they now face." *Id.* at 91.  Thus, because the losses were not the direct result of the bank extending credit on the faith of the forged signatures on the bills of lading, but the fact that the bills represented transactions that had no actual value, the losses were not covered by the bond. *Id.*

Relying on *French American Banking Corp.*, the Ninth Circuit likewise found in an unpublished opinion that there was no "direct loss" where "it was the worthlessness of the underlying collateral that directly caused the Participant Banks' losses." *Bank of Bozeman*, 404 Fed. Appx. at 119.  There, the Bond limited coverage to losses "resulting directly from" certain events. *Id.* As "[t]he Participant Banks would have sustained the same losses had the stock certificates and corporate guarantees been genuine because Transcontinental Airlines had virtually no assets or revenues . . . the losses did not 'result directly from' forgery." *Id.* Further, the court found that it was irrelevant "that the Participant Banks may not have extended credit if they had realized the collateral was worthless because the [bond] is not a policy of credit insurance."

Consistent with these cases, Plaintiff's loss in the instant case was not caused by the allegedly forged signature on the ACA, but by the fact that Del Biaggio had no securities at Merriman contrary to his representation.  Even if the signature on the ACA was genuine, Plaintiff would have suffered the same loss because it had made the loan based on nonexistent collateral.  A validly signed ACA would not have prevented the loss.  Thus, Plaintiff's loss was caused by Del Biaggio's misrepresentation about his assets, not the forgery on the ACA.

    b. <u>Proximate Cause</u>

Plaintiff does not challenge the worthless collateral argument, but instead argues that Defendant cannot rely on it because the "direct loss" language is overridden by California Insurance Code § 530.  Opp. at 12.  California Insurance Code § 530 states: "An insurer is liable for a loss of which a peril insured against was the proximate cause, although a peril not contemplated by the contract may have been a remote cause of the loss; but he is not liable for a loss of which the peril insured against was only a remote cause."  Plaintiff argues that California Insurance Code § 530

13

overwrites the direct causation requirement in the Bond, and that coverage exists when the peril insured against is a proximate cause of the loss. Thus, because Plaintiff would not have loaned the money to Del Biaggio absent the forged ACA or altered Merriman Statements, Plaintiff would not have suffered any loss.

The Ninth Circuit has found that an insurance company can contract for terms limiting coverage. In *State Farm Fire & Casualty Co. v. Martin*, the Ninth Circuit rejected the plaintiffs' challenge to an insurance policy that did not cover losses which were the result of a covered cause acting concurrently with an excluded event. 872 F.2d 319, 321 (9th Cir. 1989). Although the plaintiffs argued that the exclusion violated California Insurance Code § 530, the court found that "an insurance company has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected." *Id.* (quoting *Cont'l Cas. Co. v. Phoenix Constr. Co.*, 46 Cal. 2d 423, 432 (1956)). The court upheld the right of the insurer to contract around California Insurance Code § 530, finding that the statute "provides guidance when a policy is silent on concurrent causation; it does not prohibit inclusion of the concurrent causation provision in the [defendant's] policy." *Id.* More recent Ninth Circuit cases applying California law have likewise rejected arguments that "loss resulting directly from" should be construed to mean "loss proximately caused by," instead finding that "direct means direct" and was narrower than proximate cause. *United Sec. Bank v. Fid. & Deposit Co.*, No. 96-16331, 1997 U.S. App. LEXIS 27965, at *2-3 (9th Cir. Oct. 9, 1997); *Vons Co. v. Fed. Ins. Co.*, 212 F.3d 489, 492-93 (9th Cir. 2000) ("Under its policy, Federal provided Vons with coverage for 'direct losses' that were 'caused by' employee theft or forgery. Vons's policy did not provide coverage for third party claims. We hold that 'direct' means 'direct,' and that in the absence of a third party claims clause, Vons's policy did not provide indemnification for vicarious liability for tortious acts of its employee."). Plaintiff's argument that Defendant cannot rely on the "losses resulting directly from" language in the Bond to deny coverage is without merit.

Even if the proximate cause standard under § 530 instead of the "direct loss" language of the Bond applied, Plaintiff has not demonstrated that the forged ACA is the proximate cause of the loss at issue. Under this standard, "coverage [will] not exist if the covered risk was simply a *remote*

14

cause of the loss, or if an excluded risk was the efficient proximate (meaning predominant) cause of the loss." *Garvey*, 48 Cal. 3d at 402-03. Conversely, if the covered risk is not remote but proximate, coverage obtains. In arguing that the forgery on the ACA is the cause of the ill-fated loan, Plaintiff confuses cause in fact with proximate cause. At the hearing and in its opposition papers, Plaintiff argued that under *Mitchell v. Gonzales*, it only needed to demonstrate that the ACA was a "substantial factor" in bringing about the harm. Opp. at 14. *Mitchell*, however, limited the "substantial factor" analysis to *cause in fact*, and important to this case distinguished it from the separate question of proximate or legal cause. 54 Cal. 3d 1041, 1049 n.4 (1991) ("We do not dispute the dissent's claim that there is more than one concept included in the term 'proximate cause.' For purposes of this case, however, we focus on the jury's consideration of BAJI No. 3.75 as it relates to *cause in fact* (emphasis added)). As Justice Kennard noted in dissent, "proximate cause includes two elements: an element of physical or logical causation, known as cause in fact and a more normative or evaluative element, which the term 'proximate' imperfectly conveys." *Id.* at 1056-57.

The forgery on the ACA is at best a cause in fact, not the predominant or proximate cause as *Garvey* requires. While Plaintiff argues that but for the forgery on the ACA, no ACA would have been submitted to Plaintiff and consequently the loan would not have been made,[7] it is also true that but for Del Biaggio's misrepresentation the loan would not have been made. There are, as is typically the case, a number of causes in fact. The issue is which is the predominant or proximate cause. The ACA was merely an instrument among many others which were needed to document the loan. The predominant inducement for the loan was the misrepresented collateral, not the legal instruments needed to document the security interest therein. Thus, the predominant cause of Plaintiff's loss was the misrepresentation regarding Del Biaggio's collateral (or conversely the lack of real collateral), not Mr. Cacchione's allegedly forged signature on the ACA.

While Plaintiff thus may have claimed the altered Merriman Statements are the proximate cause of Plaintiff's loss, these statements cannot serve as the basis for coverage in this case, because

---

[7] The Court has serious doubt whether there was such cause in fact. Mr. Cacchione admitted forging a number of ACAs in furtherance of Del Biaggio fraudulent loans; it is hard to image that if pressed, he would not have signed the ACA provided to Plaintiff. The alleged forgery of his signature was likely unnecessary to effectuate the fraud here.

they do not constitute a security agreement and because Plaintiff does not possess the "original" Merriman Statements.

Accordingly, the Court finds that Plaintiff cannot demonstrate that its loss was directly or proximately caused by a forgery or alteration of a document covered by Clause E. Therefore, the Court grants summary judgment to Defendant on Plaintiff's breach of contract claim.

### 5. Bond Application

As the Court has determined that summary judgment in favor of Defendants is appropriate because the Plaintiff cannot show that its loss was caused by a forged or altered security agreement,, the Court need not determine whether Defendant would be entitled to deny coverage because of Plaintiff's alleged misrepresentation on the Bond Application.

## C. Fraud

The Court rejects Plaintiff's argument that the "anti-bundling" provision constitutes a structural fraud by permitting Defendant to deny coverage whenever an insured's claim involves more than one document. Opp. at 15.

"The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). In the instant case, Plaintiff argues that Defendant made a misrepresentation when Defendant claimed that it would cover Plaintiff for forgery, knowing that this was a "lie" because the Anti-Bundling Clause would prevent coverage where there were multiple documents.

Plaintiff's theory does not satisfy the elements of a fraud claim. Defendant clearly included the Anti-Bundling clause in the Bond; the clause is not hidden and Plaintiff had no reason to believe that the clause would not apply in California. Plaintiff provides no evidence suggesting that Defendant stated the Anti-Bundling clause would not apply, or that Plaintiff somehow relied on the inoperativeness of the Anti-Bundling clause.

Furthermore, Plaintiff is a sophisticated party that had the full terms of the Bond before it, including the Anti-Bundling clause. California courts have found that:

16

> when a plaintiff asserts that the defendant misrepresented the nature of the contract, the contract is not considered void due to fraud if the plaintiff had a reasonable opportunity to discover the true terms of the contract. The contract is only considered void when the plaintiff's failure to discover the true nature of the document executed was without negligence on the plaintiff's part.
>
> . . . Generally, it is *not reasonable* to fail to read a contract; this is true even if the plaintiff relied on the defendant's assertion that it was not necessary to read the contract. Reasonable diligence requires a party to read a contract before signing it.

*Brown v. Wells Fargo Bank, N.A.*, 168 Cal. App. 4th 938, 958-59 (2008). Here, Plaintiff had the opportunity to read the Bond, including the Anti-Bundling clause. Because Plaintiff's coverage was subject to the Anti-Bundling clause, and there was no misrepresentation or reliance suggesting otherwise, the Court grants summary judgment to Defendant on Plaintiff's fraud claim.

Finally, as the Court held above, the Anti-Bundling Clause was inconsequential to the issue in this case – whether the ACA constituted a covered security agreement. Thus, Plaintiff suffered no loss thereby.

D.  Good Faith and Fair Dealing

The Court also grants summary judgment to Defendant on Plaintiff's good faith and fair dealing claim. The covenant of good faith and fair dealing seeks to prevent one party from doing anything to injure the right of the other to receive the benefits of the agreement. *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1153 (1990). Thus, "a bad faith claim cannot be maintained unless policy benefits are due." *Id.* Further, "[t]o establish a bad faith claim, the insured must show that (1) benefits due under the policy were withheld and (2) the reason for withholding the benefits was unreasonable or without proper clause." *Century Surety Co. v. Polisso*, 139 Cal. App. 4th 922, 949 (2006).

In the instant case, Plaintiff argues that Defendant's denial was in bad faith because of the Anti-Bundling clause, which demonstrates that Defendant intended to deny coverage regardless of the merits of the insured's claim. Opp. at 17. However, the Anti-Bundling clause does not demonstrate bad faith because it was not hidden and Plaintiff knew or should have known of the clause and its impact on Plaintiff's coverage. In addition, Defendant's denial of coverage was not based only on the Anti-Bundling clause. And as noted above, even absent the Anti-Bundling clause,

17

Plaintiff's claim would still have been denied because even if the ACA is a part of a security agreement, it did not directly or proximately cause Plaintiff's loss. Accordingly, the Court grants summary judgment to Defendant on this claim.

E. Declaratory Relief

Finally, the Court grants summary judgment to Defendant on Plaintiff's declaratory relief cause of action because Plaintiff already has a fully matured cause of action for money. "A complaint for declaratory relief is legally sufficient if it sets forth facts showing the existence of an actual controversy relating to the legal rights and duties of the parties under a written instrument or with respect to property and requests that the rights and duties of the parties be adjudged by the court." *Wellenkamp v. Bank of Am.*, 21 Cal. 3d 943, 947 (1978). However, where the "complaint seeking declaratory and incidental monetary relief shows that declaratory relief is not necessary or proper at the time under all the circumstances, the complaint is in truth merely one for the consequential relief of damages." *Cardellini v. Casey*, 181 Cal. App. 3d 389, 396 (1986).

In the instant case, any wrong that has taken place occurred in the past, when Defendant declined coverage to Plaintiff. Thus, Plaintiff does not have an action for declaratory relief, but instead has a fully matured cause of action for money, through which Plaintiff is seeking the remedy of damages. Accordingly, Plaintiff is not entitled to declaratory relief and the Court will grant summary judgment to Defendant on this claim.

### III. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant's motion for summary judgment, and **DENIES** Plaintiff's cross motion for partial summary judgment. The Clerk of the Court is directed to close the file in this case and enter judgment in favor of Defendant.

This order disposes of Docket Nos. 38 and 43.

IT IS SO ORDERED.

Dated: February 22, 2012

_____
EDWARD M. CHEN
United States District Judge